**PRESTEX, INC.**

v.

**The UNITED STATES.**

No. 558–82C.

United States Claims Court.

Sept. 15, 1983.

Theodore M. Kostos, Philadelphia, Pa., for plaintiff; Guillermo L. Bosch, Ruth E. Ganister, and Stassen, Kostos & Mason, Philadelphia, Pa., of counsel.

Helene M. Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Judith E. Cohn, Dept. of Justice, Washington, D.C., and Michael McGonigle, Defense Personnel Support Center, Springfield, Pa., of counsel.

## OPINION

LYDON, Judge:

This government contract case involves review, under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976), of a decision by the Armed Services Board of Contract Appeals (Board). The Board denied plaintiff's claim for a refund of $199,-236.65, withheld by the government as liquidated damages for plaintiff's late delivery of materials under a contract to provide textile fabrics. The matter comes before the court on motions for summary judgment filed by both parties.

Both plaintiff and defendant accept the Board's findings of fact. Plaintiff, however, challenges certain legal conclusions which the Board drew from those facts. Plaintiff bases its challenge on three primary grounds. Plaintiff asserts that: (1) the government was bound by a pre-award oral promise of the government procurement agent to extend the contract's delivery schedule; (2) the government is equitably estopped from assessing liquidated damages because of plaintiff's reliance on the procurement agent's promise; and (3) the delay in delivery occurred without the fault of plaintiff, and therefore liquidated damages cannot be assessed either under the terms of the contract or under relevant case law precedents. It is well

established that the findings of fact of the Board are final, if supported by substantial evidence; however, the Board's legal conclusion can be re-examined by this court. *Chemithon Corp. v. United States,* 1 Cl.Ct. 747, 750 (1983). As indicated above, neither party contests the Board's factual findings. Thus, the matters before the court basically involve legal questions.

After consideration of the briefs of the parties, and without oral argument, it is concluded that defendant's motion for summary judgment should be granted.

### I.

Plaintiff is an established textile converter specializing in government contract work and industrial fabrics. As a converter, plaintiff acts as a middleman between the government and producers of textile fabrics. Plaintiff contracts with various textile mills to have fabrics woven to customer specifications. After purchasing the unfinished (or "griege") goods, plaintiff arranges for a finisher to finish and/or dye the material in accordance with the applicable specifications. When the textile fabrics have been woven and finished and/or dyed, plaintiff then supplies them to the government or an industrial customer.

On October 25, 1972, the Defense Personnel Support Center (DPSC) of the Defense Supply Agency (DSA), Philadelphia, Pennsylvania, issued a solicitation for bids to supply 1,953,000 yards of oxford cloth. Under the terms of the solicitation, the cloth was to be delivered in eight installments beginning in June 1973, and ending in January 1974. This delivery schedule was predicated upon the contract being awarded by December 19, 1972. The solicitation provided that, if the contract award was delayed, each delivery date would be extended a number of days equal to the number by which the award was delayed. The solicitation also identified Miss Mary Lipovac (Lipovac) as the government procurement officer and the person to contact for information concerning the solicitation.

In response to the October 25th solicitation, plaintiff submitted a bid which al-

lowed the government until December 20, 1972 to accept. One other bidder responded to this solicitation. The other bid was approximately $500,000 higher than plaintiff's bid. In order to meet the delivery schedule set forth in the solicitation, plaintiff received commitments from certain textile mills for the supply of the type of unfinished fabric specified by the contract. The commitment of one of these mills was contingent upon plaintiff securing yarn supplies for the weaving of the contract fabric. Plaintiff was able to secure commitments for yarn. In addition to its commitments from suppliers, plaintiff made arrangements with certain fabric finishers for the finishing of the contract fabric. The commitments from plaintiff's yarn and fabric suppliers and its fabric finishers were valid until December 20, 1972.

On December 18, 1972, Lipovac contacted plaintiff's vice president, Paul Graham (Graham), and requested an extension relative to acceptance of plaintiff's bid, until December 22, 1972. The extension was required in order to enable the DPSC to complete necessary paperwork with respect to Equal Employment Opportunity approvals. As a result, plaintiff's president, Serge Richards (Richards), contacted the suppliers and finishers in order to request an extension of their commitments to plaintiff. Plaintiff initially encountered some difficulty in getting its fabric and yarn suppliers to extend their commitments because of the seller's market in textiles which existed at that time. The seller's market was created by heavy governmental buying to supply the troops in Vietnam and by heavy buying by private industry. Richards was ultimately successful in securing the necessary extensions and a telegram was sent to Lipovac extending plaintiff's offer. Had the award been made on December 22, 1972, plaintiff would have been capable of meeting the contract delivery schedule assuming the commitments of the suppliers remained intact.

On December 21, 1972, Lipovac again contacted Graham and requested a further extension to December 26, 1972. This second extension was sought in order to provide sufficient time to give advance notification of the proposed award to the state congressional delegation in accordance with DSA policy. Graham contacted Richards, who in turn contacted plaintiff's fabric and yard suppliers to get an extension of their commitments.[1] As a result of these contacts, plaintiff's president learned that a further delay on the contract award would lead to delays in delivery from his mill suppliers. Specifically, one supplier indicated that an award delay would lead to delays in deliveries later in the schedule; a second stated that its initial deliveries would be delayed by more than three months; and a third had no responsible official available to give an extension.

After assessing the textile supply situation, Richards telephoned Lipovac and explained to her that an extension of plaintiff's bid to December 26, 1972, would almost certainly result in supply problems, and therefore delivery delays under the anticipated contract delivery schedule were inevitable. Lipovac then promised Richards that, if he extended plaintiff's bid to December 26, 1972, plaintiff would receive a post-award extension of the contract delivery schedule. Richards, therefore, extended plaintiff's offer in reliance on Lipovac's promise. Neither Graham nor Richards asked Lipovac if the delivery extension promise had been discussed with and approved by the contracting officer. Both Graham and Richards assumed it had been so discussed and approved. In fact, Lipovac had not discussed it with the contracting officer. Neither Graham nor Richards had discussed the matter with the contracting officer before agreeing to the extension. Plaintiff's subsequent extension acceptance telegram made no mention of Lipovac's promise.

---

1. Richards also contacted the fabric finishers and secured an extension of their commitments. Since the finishers were not responsi-ble for the delivery delays at issue here, it is not necessary to consider further their role in this matter.

On December 26, 1972, plaintiff was awarded the contract for a bid of $3,925,-530. The contract contained several provisions which are relevant to the present appeal.[2] The contract contained the following definition of "contracting officer": "The term 'Contracting Officer' means the person executing this contract on behalf of the Government * * *." The contract also contained a specific provision entitled "EXPLANATIONS TO OFFERORS" which contained a specific provision warning that "[o]ral explanations or instructions or instructions given before the award of a contract will not be binding."[3]

The liquidated damage clause under which the government assessed the sum at issue, provided in pertinent part:

If the Contractor fails to deliver the supplies or perform the services within the time specified in this contract, or any extension thereof, the actual damage to the Government for the delay will be difficult or impossible to determine. Therefore, in lieu of actual damages the Contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay, the amount set forth elsewhere in this contract. * * * The Contractor shall not be charged with liquidated damages when the delay arises out of causes beyond the control and without the fault or negligence of the Contractor as defined in paragraph (c) * * *.

The relevant part of paragraph (c) stated: "Such causes may include but are not limited to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity."

Shortly after the award, plaintiff contacted Lipovac to arrange an extension of the delivery schedule. Plaintiff was informed that it would have to wait until closer to the first delivery installment. In February, plaintiff submitted a formal extension request to DPSC. As a result of a subsequent meeting with officials from DPSC, plaintiff submitted a revised extension request on March 19, 1973.

There then followed a series of meetings between the parties and a series of administrative decisions concerning plaintiff's request for a delivery schedule extension. As a result of the March 19th extension request, the contracting officer wrote a memorandum in which he concluded that an extension was justified and should be granted. After circulation through DPSC, pursuant to normal agency policy, the contracting officer was advised by his superior that the delay was not excusable. At this point, the contracting officer concluded that an extension was not merited, but one could be negotiated for monetary consideration.

After being informed of the contracting officer's conclusion, plaintiff's executive officers negotiated with the contracting officer and his immediate superior. As a result of the negotiations, the two parties reached a tentative agreement for an extension in return for $10,000. After circulation to DPSC Office of Counsel of the proposed extension and a calculation of the anticipated liquidated damages, the DPSC counsel advised the contracting officer that there was no legal basis for granting the delivery extension request. Thereupon the contracting officer reconsidered his initial position and informed the plaintiff by letter dated September 6, 1973, that he rejected plaintiff's offer of $10,000 in exchange for an extension of time within which to deliver the contract items.

Plaintiff fully performed the contract, but due to fabric supply problems it was not able to meet the delivery schedule required by the contract. Consequently, the government withheld $199,276.65 from the contract price as liquidated damages for the late deliveries.

**2.** The contract consisted of the government's solicitation, plaintiff's offer, and the contract award.

**3.** The definition of "contracting officer" was contained in Standard Form 32, General Provisions. The provision entitled "EXPLANATION TO OFFERORS" was contained in Standard Form 33A, Solicitation Instructions and Conditions. The contract, by its terms, incorporated both forms.

## II.

### A. Oral Contract

Plaintiff's first ground for reversal of the Board's decision is that Lipovac's oral promise to grant a post-award extension of the delivery schedule created a contract binding the government to grant such an extension. Essentially, plaintiff's claim is that Lipovac's promise induced it to grant an extension of its acceptance offer to December 26, 1972. Accordingly, plaintiff interprets Lipovac's agreement to a delivery schedule extension and plaintiff's corresponding promise to extend its bid as creating a binding contract between plaintiff and the government. Plaintiff therefore seeks to have the subsequent written contract reformed to reflect this earlier oral contract.[4]

Plaintiff's claim of an oral contract binding the government to a delivery schedule extension fails because Lipovac had no actual authority to bind the government to a contractual obligation.[5] It is a well recognized rule that "anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). *See also Lin v. United States,* 3 Cl.Ct. 213, 216, (Cl.Ct.1983); *Dalaly v. United States,* 3 Cl.Ct. 203, 206, (Cl.Ct. 1983). *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 711–712, 468 F.2d 922, 925 (1972). The government is not bound by acts of its agents beyond the bounds of that agent's actual authority. *Federal Crop Ins. Corp. v. Merrill, supra. See also C.P. Squire Contractors v. United States,* 716 F.2d 865, 868 (Fed.Cir.1983); *City of Klawock v. United States,* 2 Cl.Ct. 580, 586 (1983). Nor can the court find an implied-in-fact contract when an express contract fails, because any oral representation is also beyond the contracting official's actual authority. *Nuss v. United States,* 127 Ct.Cl. 197, 207, 117 F.Supp. 413 (1954).[6]

Lipovac's promise to extend the contract delivery schedule in exchange for plaintiff's promise to extend its offer was clearly beyond her actual authority as procurement agent. The contract itself contained the explicit warning that "oral explanations or instructions or instructions given before the award of a contract will not be binding." Moreover, the regulations pertaining to the

---

4. In a footnote to its brief, defendant asserts that plaintiff's claim for reformation is time barred by the 6-year statute of limitations for contract claims in 28 U.S.C. § 2501 (1976). The basis of defendant's argument is that the Board lacked jurisdiction over plaintiff's reformation claim. Since this claim would be construed as a claim seeking reform of a contract based upon a mistaken bid, defendant argues, the statute of limitations started running when the claim accrued in December 1972. This argument ignores the court's holding in *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847 (1966). In *Nager,* the court held that the statute of limitations began running on all claims arising from a contract only after an administrative tribunal had rendered final action on the claims properly within its jurisdiction. Since in its appeal to the Board plaintiff sought other remedies properly within the Board's jurisdiction, under *Nager,* the statute of limitation did not begin to run on any of its claims under this contract until the Board's final decision in June 1981. Plaintiff's appeal from that decision was timely, as its appeal was filed within 2 years of that decision.

5. To the extent that plaintiff's contract claim is based on an express oral contract, it fails on the additional ground that it violated the statutory requirements tht an agreement be in writing in order to bind the government. 31 U.S.C. § 200(1)(a) (1970) (current version at 31 U.S. C.A. § 1501 (1983)). *See United States v. American Renaissance Lines, Inc.,* 494 F.2d 1059, 1061–1065 (D.C.App.1974), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). *See also Narva Harris Constr. Corp. v. United States,* 216 Ct.Cl. 238, 243–245, 574 F.2d 508, 510–511 (1978). Lipovac's express oral promise also failed to be a valid modification of the delivery term in the written contract, since under the applicable regulations a contract modification was "any written alteration." 32 C.F.R. § 1.201–2 (1972).

6. Plaintiff cites several cases to support its contention that the procurement agent's promise bound the government, *e.g., Rafael Torres, Jr. v. United States,* 126 Ct.Cl. 76, 112 F.Supp. 363 (1953), *MacDougald Constr. Co. v. United States,* 122 Ct.Cl. 210 (1952). However, none of these cases involved the issue of the authority of the government official who made the representations in question.

procurement of supplies for the armed services explicitly command that any bid which does not conform to the solicitation's delivery schedule must be rejected as nonresponsive. 32 C.F.R. § 2.404–2(c) (1972).

Plaintiff, a corporation with considerable experience in government contract work, bore the responsibility of making sure that Lipovac had the authority to extend the contract delivery schedule. It was clear from both the contract itself and the relevant governmental regulations that Lipovac lacked actual authority to make such an agreement. Therefore, Lipovac's promise was unenforceable and created no express or implied-in-fact contract between the government and plaintiff.

Plaintiff in its reply brief, without citing any authority, argues that the rule of *Federal Crop Ins. Corp. v. Merrill, supra,* requiring a contracting official to have actual authority in order to bind the government, applies only to affirmative promises to pay money.[7] Plaintiff characterizes the assessment of liquidated damages in this case as a penalty imposed on it by the government. Plaintiff then argues that the rule of *Federal Crop Ins. Corp. v. Merrill, supra,* is inapplicable in this case, since Lipovac's promise was essentially a promise not to penalize plaintiff.

Aside from plaintiff's mischaracterization of the nature and import of the liquidated damages clause,[8] this argument has the additional deficiency of being premised on a erroneous interpretation of the rule in *Federal Crop Ins. Corp. v. Merrill, supra.* The rule that the government can be bound only by an official with actual authority to make the agreement is not limited to actions involving affirmative acts to pay money. For example, in *Prater v. United States,* 612 F.2d 157 (5th Cir.1980), *on reh'g,* 618 F.2d 263 (5th Cir.1980), the court held that an alleged promise by a government agent to allow a landowner to repurchase his land from the government was unenforceable because the agent lacked the actual authority to make such a promise. Similarly in *Dresser Indus., Inc. v. United States,* 596 F.2d 1231 (5th Cir.1979), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980), the court held that an alleged promise by the Securities and Exchange Commission (SEC) not to prosecute the plaintiff was unenforceable because both the SEC and its agents lacked the actual authority to make such a promise. *See also Posey v. United States,* 449 F.2d 228, 234 (5th Cir. 1971) and cases cited therein. As the case law precedent in this area demonstrates, the validity of Lipovac's promise to grant a post-award delivery schedule extension depended upon the extent to which she had the actual authority to make it. Since she had none, the promise was invalid and unenforceable.

Additionally, plaintiff's claim to a binding oral contract must fail because the oral promise conflicted with the subsequent written contract. This court's predecessor has held that a separate, prior oral agreement may be valid if it serves as consideration or inducement for a subsequent written contract and does not vary the terms of the written contract. *McCloskey v. United States,* 66 Ct.Cl. 105, 127 (1928). It is therefore clear that a prior oral agreement is invalid and unenforceable, if it conflicts with or varies the terms of the subsequent written contract, since all understandings and agreements are considered to have been

---

7. Plaintiff uses this argument for its estoppel claim only. Since, however, the issue of Lipovac's authority is common to both plaintiff's contract and estoppel claims, the argument asserted for the estoppel claim is equally applicable to the contract claim.

8. It is well established that liquidated damages serve as compensation for injury caused by a party's breach of contract when the amount is fair and reasonable. *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411–412, 68 S.Ct. 123, 125–26, 92 L.Ed. 32 (1941). Plaintiff bears the burden of showing the punitive nature of the liquidated damages by demonstrating that there is no reasonable correlation between the amount of liquidated damages and the probable loss to the government as a result of delay in performance. *Jennie-O-Foods, Inc. v. United States,* 217 Ct.Cl. 314, 338, 580 F.2d 400, 414 (1978). Plaintiff in this case has made no such showing beyond the basic assertion that the liquidated damages assessed constituted a penalty.

merged into the subsequent written contract. *Carden v. United States,* 87 Ct.Cl. 189, 201 (1938); *Ship Constr. & Trading Co. v. United States,* 91 Ct.Cl. 419, 456 (1940), *cert. denied,* 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941). Lipovac's pre-award oral promise involved an extension of the contract delivery schedule. Since the delivery schedule was a specific term in the subsequent written contract, her oral promise varied a specific term of the subsequent contract.

Consequently, Lipovac's promise was invalid and unenforceable because Lipovac lacked authority to make such a promise or to enter into any such agreement and further because any such agreement would, in any event, have improperly varied specific terms of the agreement actually signed by the parties. Plaintiff's briefs make an impassioned argument that the totality of the circumstances support recovery by plaintiff herein. However, case law discloses that such impassioned arguments must fall in those situations where parties deal with persons who lack authority to bind the government. The "risks" and "burdens" rest on contractors to ascertain the authority of those with whom they deal relative to government contracts before they place reliance thereon. *See Federal Crop Ins. Corp. v. Merrill, supra.* This is all the more true in this case since plaintiff's top officials were very experienced in government contract matters. *See Byrne Organization, Inc. v. United States,* 152 Ct.Cl. 578, 587, 287 F.2d 582, 587 (1961). Finally, it must not be overlooked that there was another bidder involved relative to this solicitation. To allow oral contracts in the pre-award stage to vary specific delivery requirements of the solicitation, without disclosure to the other bidder(s) would impinge on the integrity of the advertised procurement process.[9]

In light of the above discussion, it is clear that Lipovac's promise to plaintiff to extend the delivery schedule after award of the contract to plaintiff was invalid and unenforceable against the government. Lipovac lacked authority to make such a promise or to enter into any such agreement binding the government. Further, any such oral promise or agreement would, in any event, have improperly varied the specific terms of the written contract executed by the parties.

### B. *Equitable Estoppel*

Plaintiff's second contention is that the government should be equitably estopped from assessing liquidated damages because of plaintiff's reliance on Lipovac's promise. Of course plaintiff's estoppel claim encounters the same legal obstacle as its oral contract claim, *i.e.,* Lipovac's lack of authority to make such a promise. The rule of *Federal Crop Ins. Corp. v. Merrill, supra,* is as equally applicable to plaintiff's equitable estoppel claim as it is to plaintiff's oral contract claim. *Prater v. United States, supra,* 612 F.2d at 160; *see Jackson v. United States,* 216 Ct.Cl. 25, 41–42, 573 F.2d 1189, 1197–1198 (1978); *Byrne Organization, Inc. v. United States, supra,* 152 Ct.Cl. at 587, 287 F.2d at 587.

Plaintiff attempts to overcome this legal obstacle to its equitable estoppel claim with

---

**9.** It may well be that the $500,000 disparity between plaintiff's bid and the other higher bid reflected a contingency factor that the higher bidder incorporated into its bid in recognition of the fact that the existing contract delivery schedule would be difficult to meet given the existing seller's market in textile goods. To compensate for the foreseeable difficulty in procurement of the contract material, the other bidder may well have increased its bid to reflect the possible assessment of liquidated damages. In such a situation, clearly it would be inequitable to allow plaintiff to submit its bid based upon an oral and private understanding that the delivery schedule would be extended to accommodate expected procurement problems, after award, while its competitor's bid reflected its response to the anticipated delivery problems attendant to the original delivery schedule. Plaintiff's competitor's bid may well have been lower if it had been advised before bidding, that the delivery schedule would be extended after award. One need not speculate whether the award in such an event might have gone to the competitor. It is sufficient to note that the appearance of vulnerability of the integrity of the advertised procurement process in this case is justification for rejection of oral agreements between contractors and procurement officials who are not clothed with authority to make any such agreements.

two arguments. The first is plaintiff's limitation of the *Federal Crop Ins. Corp.* rule to cases involving unauthorized promises to pay money. This argument was considered and rejected in the above discussion of plaintiff's oral contract claim.

Plaintiff, as a second argument, analogizes this case to *Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 427 F.2d 1233 (1970) and contends that the government is estopped from asserting Lipovac's lack of authority. In *Max Drill,* the Court of Claims allowed an equitable adjustment to a government contract because of certain representations made by the technical representative of the contracting officer. The position and promise of Lipovac are not analogous to the position and representations of the technical representative in *Max Drill. Max Drill* involved the interpretation of an ambiguous contract specification by the contracting officer's technical representative. This technical representative had designed the government project involved and was authorized to make minor changes in the contract. Lipovac, on the other hand, was merely the procurement agent for this contract. She was not a technical representative of the contracting officer, nor was she the designer of the underlying government project. Further, her promise did not involve the interpretation of an ambiguous provision in the contract. Her promise was an attempt to vary a specific term in the written contract. Consequently, *Max Drill* is inapposite to the present case, and the government is not estopped from asserting Lipovac's lack of authority. As stated in *Byrne Organization, Inc. v. United States, supra,* 152 Ct.Cl. at 578, 287 F.2d at 587: "It is an established proposition that estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government. * * *"

### C. *Fault re Delay in Delivery*

Plaintiff's final contention is two-pronged. Plaintiff argues first that its delay in delivery constituted excusable delay under the terms of the contract since the delay was beyond the control of and without the fault or negligence of plaintiff, and second that, in any event, the court should abrogate the liquidated damages clause of the contract because the government was partially responsible for the delivery delays. Both contentions, in effect, were rejected by the Board.[10] They are equally unpersuasive here.

In arguing that its delay was excusable, plaintiff points to the language of the liquidated damages clause of the contract. That clause states in relevant part: "[t]he Contractor shall not be charged with liquidated damages when the delay arises out of causes beyond the control and without the fault or negligence of the Contractor as defined in paragraph (c) above * * *." Paragraph (c) defines excusable causes as those causes which "include, but are not restricted to, acts of God or of the public enemy, acts of the government in either its sovereign or contractual capacity. * * *"

Plaintiff's argument is that the delays were beyond the control and without the fault or negligence of plaintiff because it warned the government procurement agent about probable delays prior to extending its bid. Moreover, plaintiff argues that its supply problems arose as a result of the acts of the government in its sovereign and contractual capacity. Plaintiff contends that the government caused the delays because governmental price controls on cotton yarn made it difficult to obtain the necessary yarn, and because heavy textile buying by the government for its Vietnam requirements created a seller's market in textiles

---

10. The Board majority opinion stated in pertinent part:

"By relying on an unenforceable promise not encompassed by the written contract, appellant assumed the risk that the promise would not be performed. In the face of this imprudent reliance, the Board cannot find that resulting performance delays were beyond appellant's control, excusing liability for liquidated damages. To find excusability here would be to give post-award sanction to an unenforceable pre-award promise."

which, in turn, made it difficult for plaintiff to procure the necessary material within the time allowed by the contract.

Plaintiff cannot avoid responsibility for the delivery delays simply because the government procurement agent was informed about the probability of such delays prior to the contract award. Richards and Graham, plaintiff's officers in contact with Lipovac concerning this contract, never spoke directly with the contracting officer about the probability of delivery delays and the resulting need for a delivery schedule extension. Nor did Richards or Graham ask Lipovac if she had checked with the contracting officer to clear her promise of a delivery extension. Indeed, plaintiff's officers made no mention of Lipovac's promise in the telegram sent on December 22, 1972 confirming the extension of plaintiff's bid to December 26, 1972. Aware of the delivery problems before it entered into the contract, plaintiff assumed the risk that these problems might endanger its ability to meet the contract delivery schedules. It was under some obligation to cover itself by the submission of a bid contingent on delivery dates it could meet, or a request of the contracting officer that a new delivery schedule be established. It cannot escape the risks of its own imprudent silent reliance on one who had no authority to change the delivery schedule while submitting its acceptance of the written delivery schedule set forth in the contract.

Plaintiff was no stranger to the ground rules of government contract work since it specialized in government contract work. As the Supreme Court noted in *Federal Crop Ins. Corp., supra:* "The oft quoted observation * * * that 'Men must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Federal Crop Ins. Corp. v. Merrill, supra,* 332 U.S. at 385, 68 S.Ct. at 3 quoting *Rock Island, Arkansas & Louisiana R.R. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). In relying on Lipovac's unauthorized promise, plaintiff failed to turn the requisite square corner of only relying on the authorized representations of government officials. Consequently, plaintiff effectively chose to assume the risk of having to pay liquidated damages in order to gain the economic benefits of this large government contract.

Similarly, plaintiff cannot successfully contend that its delivery delays were excusable because of the extensive government textile buying and the government price controls which existed at the time of the contract. The prime contractor is responsible for the delays caused by his suppliers unless no feasible alternative supplier exists. *United Foundation Corp. v. United States,* 158 Ct.Cl. 41, 48 (1968) (failure of prime contractor's concrete supplier to make timely delivery did not constitute excusable delay); *Whitlock Corp. v. United States,* 141 Ct.Cl. 758, 763–764, 159 F.Supp. 602, 606 (1958), *cert. denied,* 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58 (1958) (prime contractor bound by contract despite insolvency of its supplier). The Board did not find that plaintiff's delay was excusable and a review of the record supports the Board's failure to make such a finding.[11]

Additionally, plaintiff, not the government, was primarily responsible for the delivery delays. Plaintiff extended its bid knowing that delivery delays were most probable. Plaintiff in asserting its delay was excusable primarily relies on two cases, *Consolidated Molded Products Corp. v. United States,* 220 Ct.Cl. 594, 600 F.2d 793 (1979) and *Inso Electronics Products, Inc.,* ASBCA No. 23687, 82–1 BCA 15,490 (1981). Plaintiff relies on the fact that in *Consolidated Molded Products, Inc.* the court noted that the shortage of epoxy resin caused by

11. The Board found that plaintiff switched one of its suppliers soon after the contract was awarded on the belief that the original supplier's performance might not be reliable since it was initially unwilling to fully honor its commitment. This substitution meant a delay in deliveries from that supplier until the Spring or Summer of 1973; whereas the original supplier would have begun deliveries in January 1973.

the 1973 Arab Oil Embargo constituted excusable delay for the prime contractor. Plaintiff also relies on the fact that in *Inso Electronics, Inc.*, the Armed Services Board of Contract Appeals found excusable delay when the government failed to promptly respond to plaintiff's inquiries on government specifications.

Plaintiff's reliance is misplaced, however, since neither *Consolidated Molded Products Corp.* nor *Inso Electronics, Inc.* involved a contractor that knew of the delaying circumstances before it submitted its bid. In *Consolidated Molded Products Corp.* the contract was awarded in April 1973 while the Arab Oil Embargo did not effect plaintiff's resin suppliers until the last quarter of 1973. In addition, the government stipulated that the epoxy resin needed by plaintiff was unavailable for the 2-month period which the Board felt was excusable. It is also noted that the contractor in the *Consolidated Molded Products Corp.* case sought release from the contract for impossibility of performance and not merely an extension of time to deliver the contract item. In *Inso Electronics, Inc.*, the circumstances which gave rise to the excusable delay did not occur until 3 months after the contract was awarded.

Clearly, these cases offer little support for plaintiff's position that its delay was excusable. This plaintiff knew about the probability of delivery delays before it agreed to extend its bid. As discussed above, this plaintiff risked the consequences of delivery delays in order to procure a large contract. Consequently, the delivery delays, under the circumstances of this case, cannot be considered as beyond the control of plaintiff or without its fault or negligence.

■ Finally, plaintiff urges that the court follow the principle that no liquidated damages can be assessed when both parties are at fault for the delay in performance. It is true that this court's predecessor did not allow the government to assess liquidated damages when the government was partially responsible for the delay. *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509 (1965); *Schmoll v. United States*, 91 Ct.Cl. 1 (1940).

These cases, however, are inapposite to the present case. Here, the delivery delays were the result of plaintiff's failure to secure adequate supplier commitments prior to extending its bid. Although the government's delay in awarding the contract made plaintiff's original supplier commitments lapse, plaintiff could have refused to extend its bid without an authorized extension of the delivery schedule. In its desire to be awarded this large contract, plaintiff instead chose to rely on the unauthorized promise of the government procurement agent. Under these circumstances, the government did not share responsibility for the delivery delays since plaintiff had it within its power to avoid these delays. It was not forced into the contract. Therefore, the assessment of liquidated damages was proper in this case.[12]

### Conclusion

For the reasons discussed above, defendant's cross-motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, with plaintiff's complaint to be dismissed.

---

**12.** In its brief, plaintiff lists as one of its grounds for appeal the refusal of the Board to find that the contracting officer's preliminary determination of excusable delay was improperly overruled by the contracting officer's superiors. Plaintiff, however, presented no argument in its brief to support this contention. From a review of the plaintiff's brief to the Board, it seems that plaintiff objects to the fact that the contracting officer changed a preliminary determination favorable to a finding of excusable delay to an unfavorable decision of no excusable delay after obtaining advice from his superiors and from the DPSC's legal counsel. Plaintiff's objection to this change of heart is without merit under the circumstances of record since contracting officers are free to seek advice and agree with that advice. *Pacific Architects and Eng'rs, Inc. v. United States*, 203 Ct.Cl. 499, 491 F.2d 734 (1974). The challenged procedure involving the contracting officer in this case was consistent with this principle.